Hyon N. MORRISSETTE, Plaintiff,

v.

A&W ALASKA, INC.; MTN. View Shell, Food Mart and A & W Restaurant; Lisa Suzuki, Terry Suzuki, Defendants.

No. A04–0017CVRRB.

United States District Court,
D. Alaska.

April 13, 2005.

*AMENDED ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING COUNTERCLAIM UPON RECONSIDERATION*

BEISTLINE, District Judge.

## I. INTRODUCTION

The Court has now completed its review of the depositions taken in this matter, the

extensive pleadings filed to date, and the affidavits filed herein. Based thereon, and for the reasons set forth below, Defendants' Motion for Summary Judgment (Docket No. 35) is hereby **GRANTED** and Defendants' counterclaim for damages is **DISMISSED**.

The Court has now also considered Plaintiff's Motion for Reconsideration and Defendant's opposition thereto. In response thereto, the Court enters this Amended Order Granting Defendant's Motion for Summary Judgment And Dismissing Counterclaim Upon Reconsideration. In doing so, the Court has modified some of the language in its original order, after considering the briefing of the parties, and has addressed the discovery issue raised by Plaintiff. This Amended Order supersedes the prior order entered herein.

## II. FACTS

The depositions taken in this matter, as well as the affidavits and pleadings filed with the Court, provide an overview of the present dispute. Indeed, many of the facts are uncontested. The general areas of dispute relate to oral discussions between the parties.

The history of this case is problematic. It began with a vague and somewhat ambiguous contract for the purchase and sale of the Mountain View Shell, Food Mart, A & W Restaurant. The parties were friends and members of the same minority community in Anchorage. The sales contract contained a provision giving Plaintiff Hyon N. Morrissette and her ex-husband the right of first refusal with regard to a second similar business that Defendants A & W Alaska Inc., *et al.* (hereinafter collectively referred to as Defendants) also owned in Anchorage. Plaintiff paid Defendants roughly $250,000 for the business and inventory. The land and building that housed the business were owned by Shell Oil Co. (Shell) and a monthly rental rate,

or franchise fee, of $14,596 was required to be paid by the operator of the business to Shell. For the purchasers to obtain full control of the business, Shell would have to approve and transfer the franchise to the purchaser. The contract between the parties specifically acknowledged this, indicating that in the event Shell did not approve the sale, the agreement would revert to that of a "sublease/management transfer."

Almost from the beginning there were problems. Although both Plaintiff and Defendant Terry Suzuki (Suzuki) were business people, neither envisioned nor provided for the problems that soon developed.

To begin, Plaintiff's ex-husband, Kyung Rock Kim (Rocky), who was listed along with Plaintiff as a purchaser of the business and who took over management of the business after its purchase in November of 2002, had no experience operating the type of business involved. Additionally, he did not speak English, while the business catered to primarily English speaking customers. As a result, the business never became profitable and lost money from the start. Soon Rocky fell behind in his rental payments to Shell.

Second, the marriage between Plaintiff and Rocky "blew up" soon after Rocky began operating the business. This led to a messy divorce during which the Plaintiff and Rocky seldom communicated. Rocky continued to poorly manage the business while the divorce was pending, with little or no involvement of Plaintiff. Rocky managed the business for roughly nine months, between November of 2002 and July of 2003.

The business was awarded to Rocky in the divorce trial, but Plaintiff received a credit in the property distribution of $250,000, which was the price she had paid for the business and inventory. This credit was based on the trial judge's conclusion that Rocky had virtually destroyed the

business during the time he operated it. Rocky, however, had apparently lost interest in the business by the time of the divorce and made no effort to salvage it. As a result, the divorce court, at Plaintiff's request, transferred ownership of the business to Plaintiff effective August 1, 2003. When Plaintiff reentered the business, she found the inventory depleted and the business records missing.

Plaintiff, by this time, was experiencing depression as a result of the divorce. She still had her own business to run and no longer was interested in operating a gas station. Nevertheless, she wanted to recoup as much of her loses from the business as possible. Plaintiff, therefore, contacted Suzuki, from whom she and her ex-husband had purchased the business and who was now residing outside Alaska, and talked to him about managing or buying back the business. Suzuki was reluctant to get involved but indicated in his deposition that we wanted to help Plaintiff if he could. As a result, he agreed to return to Alaska, briefly, to assist in the management of the business.

Significantly, although Plaintiff and her ex-husband had purchased the business, neither she nor her ex-husband ever completed the franchise documents. As a result, as far as the landlord and franchiser Shell was concerned, the business was still owned by Defendants. Shell, however, was aware of Plaintiff's involvement with the business and remained willing to work with her and/or her ex-husband to complete the franchise documents.

Defendant Suzuki resumed operation of the business on August 5, 2003. Suzuki did this on the condition that Plaintiff provide him with money to cover rent and expenses, for he was unwilling to put his own money into the business until he could see that it would become profitable. Toward this end, Plaintiff gave Suzuki roughly $10,000, on two different occasions, and the parties began negotiating the terms of a possible buyback of the business. By this time they were both represented by attorneys.

The parties never reached an agreement with regard to the buyback and the business never became profitable. Furthermore, Plaintiff never completed the franchise documents with Shell, apparently believing that it would not be necessary given the anticipated buyback.

Once it became clear that a buyback agreement was not going to be reached, Plaintiff sought, in mid-September, to retake physical control of the business from Suzuki. Suzuki, though, was unwilling to permit this unless Plaintiff would provide him assurance that he would be reimbursed for the monies he had invested in his attempt to rebuild the business. Thereafter, upon learning that Plaintiff no longer would contribute financially toward salvaging the business, and in order to avoid incurring any further loss, Suzuki returned the business to Shell. He had been operating it for roughly four and one half months. Suzuki contends that he returned the business to Shell with Plaintiff's agreement. While Plaintiff acknowledges that Suzuki told her of his intention to return the business to Shell unless she paid the rental payments, she denies agreeing to it. She still wanted him to buy the business back from her.

Throughout this entire process, the only written document executed by the parties was the first contract of sale. There was no written agreement for Suzuki to manage the business once he returned to Alaska. There was no agreement regarding monies given to Suzuki by Plaintiff to operate the business, and the parties were never able to reach a buyback agreement.

Now, both parties believe that they are owed money by the other.

## III. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if there is no genuine dispute as to material facts and if the moving party is entitled to judgment as a matter of law. The moving party has the burden of showing that there is no genuine dispute as to material fact.[1] The moving party need not present evidence; it need only point out the lack of any genuine dispute as to material fact.[2] Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[3] All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-movant.[4] However, the nonmoving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[5]

## IV. DISCUSSION

### A. Defendants' Motion for Summary Judgment is Hereby Granted.

Defendants' Motion for Summary Judgment (Docket No. 35) is dispositive with regard to all of Plaintiff's claims.

First, Defendants properly note that, based on the stipulation of the parties, the Petroleum Marketing Practices Act is no longer before the Court.

Second, the Court concludes that there is no evidence of fraud on Defendants' behalf with regard to notifying Plaintiff and/or her ex-husband of the need for Shell to approve the sale of the business. Both Plaintiff and her ex-husband knew about this requirement. In fact, they met with John Scott, the Area Marketing Manager for Shell, on at least one occasion to discuss this matter and exchanged e-mails on several other occasions.[6] Moreover, Plaintiff's knowledge of the need to obtain the franchise from Shell was admitted by virtue of Plaintiff's failure to respond to certain requests for admission(s).[7] Furthermore, the need for Shell to approve the franchise agreement was specifically referred to in the initial contract between the parties. In particular, Plaintiff's deposition at 25–26 makes it clear that both she and her ex-husband were well aware of the need to fill out the requisite franchise papers. They simply chose not to give it high priority. And there is no evidence to suggest that Suzuki interfered with and/or failed to cooperate with Plaintiff in obtaining the Shell franchise.

Third, there is no evidence in the contract, or presented elsewhere, to suggest that an accounting was required to be provided to Plaintiff at the time of sale. Part of the problem with this transaction is the fact that neither party seemed to believe that details needed to be reduced to writing. They were happy accepting one another's word.

Fourth, it was clear that once Plaintiff offered to sell back the business, she no longer wished to exercise a right of first refusal in Defendants' other gas station.

1. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

2. *Id.* at 323–325, 106 S.Ct. 2548.

3. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–9, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

4. *Id.* at 255, 106 S.Ct. 2505.

5. *Id.* at 248–9, 106 S.Ct. 2505.

6. Clerk's Docket No. 67, John Scott Aff.

7. Clerk's Docket No. 35, Ex. 2.

Plaintiff's deposition testimony indicates that she no longer wished to engage in this type of business. Furthermore, if Plaintiff desired to purchase the second station, the record reveals she could have. But Plaintiff has at no time during the course of this litigation averred that it was her intent or desire to purchase the second gas station or that she would do so if offered. In contrast, Suzuki's uncontested affidavit, attached to Defendants' Motion for Summary Judgment (Docket No. 35, Ex. 6), makes it clear that this second station has not been sold and is available if Plaintiff wishes to purchase it. This is further verified by the uncontested affidavit of Kyoung H. Lee, attached to Defendants' Supplemental Argument and Reply to Plaintiff's Supplemental Argument in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment.[8]

■ Fifth, although the parties both discussed a buyback of the business, they were unable to reach an agreement. Each party had a different understanding of what was going to happen. The Court, however, need not devine their intentions, for the relief Plaintiff seeks is precluded by AS 09.25.010(a)(6), i.e., the Statute of Frauds, which requires that a contract of this nature be in writing. Furthermore, even if there were an oral promise to execute a written agreement, as Plaintiff seems to allege, it would have to be in writing to be enforceable.[9] And it is clear that there was no "meeting of the minds" with respect to the buyback of the business.[10] Despite extensive negotiations, the parties never reached an agreement they could sign. This was an unfortunate business development, but it does not establish a cause of action for damages.

Plaintiff further contends Suzuki wrongfully prevented her from resuming control of the business in mid-September after the buyback negotiations failed. Here again, there is a lack of writing and no "meeting of the minds" with regard to what the parties' intentions were during this time frame. Plaintiff acknowledges inviting Suzuki back into the business and providing him with the keys. She even provided him with money to operate the business. Suzuki was there by invitation and was continuing to make the monthly rental payments to Shell. Plaintiff was unwilling to make any further such payments or to reimburse Suzuki for the monies he had allegedly incurred in operating the business. Suzuki also remained a title holder of the business as far as the landlord, Shell, was concerned. He, therefore, was the one liable for the monthly rental payments and, from the landlord's perspective, the only one legally entitled to be there. Having delivered the keys of the business to Suzuki and having failed to take any action with regard to the Shell franchise, and by no longer making rental payments to Shell, Plaintiff appears to have abandoned the business. At best, this was a time of mass confusion, characterized by mutual distrust and uncertainty. There was no contract governing the parties' rights and obligations at this stage of their relationship and, therefore, no basis to argue breach.

■ Although not set forth in her complaint, Plaintiff now suggests that because

---

8. Clerk's Docket No. 79, Ex. 2.

9. *Reeves v. Alyeska Pipeline Service Company*, 926 P.2d 1130 (Alaska 1996).

10. "[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." Restatement (Second) of Contracts § 17 (2004). "The [manifestation of mutual assent, and/or the] element of agreement[,] is sometimes referred to as a 'meeting of the minds.'" Restatement (Second) of Contracts § 17 cmt. c (2004).

the franchise agreement Defendant had with Shell required that Shell approve any sale or transfer of the business operation *before* any such sale was concluded, the sale herein was invalid. This is not the case, for the contract in question required further conduct on the part of Plaintiff to obtain the full benefit. Defendants fully performed under the contract and sold all the interest they had in the business with the understanding that if Shell, for some reason, did not approve the sale, the relationship between the parties would revert to that of a lessor-lessee. While this is somewhat vague, it does indicate that the parties contemplated the possibility that Shell might not approve the transfer. Furthermore, Shell provided Plaintiff with the franchise documents well after the sales transaction between the parties was concluded, indicating Shell's willingness to approve the new franchise after the sale took place, and establishing that Plaintiff was not prejudiced even if Plaintiff's allegations with regard to the Shell franchise were accurate.

### B. Defendants' Counterclaim is Hereby Dismissed.

 Throughout this entire matter, Plaintiff and Defendants were basically two ships passing in the night. Each assumed things on the part of the other, but neither really understood what the other was thinking. This was exacerbated by the lack of a writing, even during times when both parties were represented by counsel. This was as much true for Suzuki as it was for Plaintiff.

Defendants now claim damages and seek reimbursement for time and money spent in rebuilding the business, but they have no writing to indicate an agreement with Plaintiff. Consequently, they have no contract to enforce. Each party provides the Court with facts, generally the same facts, and then asks the Court to interpret those facts favorably with respect to their individual cause(s). It is clear, however, that once Plaintiff received the business from her ex-husband in the divorce action, neither Plaintiff nor Suzuki had a "meeting of the minds" sufficient to create a contract, and certainly not sufficient enough to create a cause of action upon which relief can or may be granted. Therefore, the Court concludes Defendants' counterclaim must be **DISMISSED** as well.

## V. DISCOVERY ISSUES

Plaintiff also complains about the lack of discovery received from Defendants and points to discovery requests that were made after the close of discovery. Defendants, however, did comply with the various discovery requests that were timely made. Once discovery closed, Plaintiff was not entitled to further discovery. Nevertheless, the Court did require Defendants to produce certain items that Plaintiff sought, after the close of discovery, even though some or most of it could have been obtained from Shell or from other sources. Furthermore, in January of 2005, when the Court became concerned about Plaintiff's trial preparation, the Court offered to postpone the trial, which offer Plaintiff rejected. More importantly, most of the discovery Plaintiff speaks of was not relevant to the issues addressed in the Court's summary judgment order. The Court ultimately concluded that the business relationship between the parties was so vague and so uncertain that there was no basis upon which either of them could enforce a contractual obligation on the other. This conclusion would not have been impacted by the additional discovery Plaintiff sought.

## VI. CONCLUSION

There is no doubt that this is an unfortunate case. It is unfortunate, however, because of the manner in which the parties

entered into the series of transactions that led to the present dispute. Plaintiff and Suzuki were friends and members of the same cultural minority who felt that they understood one another and did not need a formal writing to document the details of their business relationship. However, they did not understand one another and never really had a meeting of the minds as to their respective rights and obligations. To make matters worse, once Plaintiff acquired the business, she gave it to her husband who had virtually no understanding of how to operate it. As a result, the business never became profitable and was one of several sources of contention between Plaintiff and her husband in their divorce.

Had things ended with Plaintiff and Rocky's divorce, Plaintiff would have had no basis for a claim against Suzuki, for he had done what he was required to do under their initial agreement. Suzuki had delivered the business to Plaintiff and had introduced both Plaintiff and her husband to the Shell representative with whom they would deal in arranging for the franchise transfer. And Suzuki remained willing to sell his other gas station to Plaintiff if she so desired. But things did not end there. Once the gas station was returned to Plaintiff by the divorce court, she contacted Suzuki, who was now residing out of state, and requested that he resume management of the business with the expectation of selling it back to him. Suzuki returned to Alaska with the hope of making the business profitable and with the possibility of purchasing it back. Again there was no writing between the parties and their respective expectations differed greatly. Plaintiff, however, cannot point to any contractual breach on Suzuki's behalf during this period of time, other than the failure of the parties to reach a buy back agreement. When the business finally failed and was returned to Shell, it was because neither Plaintiff nor Defendant

Suzuki were willing to incur any further losses to try and save the business. There is simply no cause of action under these unfortunate facts upon which relief can be granted.

## VI. JUDGMENT

Judgment will enter consistently herewith. Any pending motions are hereby **DENIED** as moot. The trial is vacated.